**David LEVY and Miriam Levy, Plaintiffs,**

v.

**The CITY OF NEW YORK, et al., Defendants.**

**No. 87 Civ. 8670 (PKL).**

United States District Court, S.D. New York.

Dec. 26, 1989.

---

Michael L. Previto, New York City, for plaintiffs.

Law Department, the City of New York, New York City (Gabriel Taussig, Virginia Waters, Lisa Yee, Robin R. Rossenfeld, of counsel), for all City defendants.

## ORDER & OPINION

LEISURE, District Judge.

Plaintiffs have brought an action pursuant to 42 U.S.C. §§ 1983, 1985 and 1986 for injunctive and monetary relief against the City of New York, various City officials and employees, and two of their former law firms. Plaintiffs allege their rights were violated by the actions of the City and the other defendants in relation to property owned by plaintiffs in the Borough of Manhattan. The City of New York and all other defendants affiliated with the City have moved pursuant to Fed.R.Civ.P. 12 for dismissal of this action on the pleadings.[1] The City defendants have further moved for sanctions against plaintiffs and their attorney pursuant to Fed.R.Civ.P. 11.

## BACKGROUND

This is a case arising out of a complex series of regulatory actions taken with regard to plaintiffs' property. On August 7, 1984, plaintiffs purchased, for $14,000, a small apartment building located at 1657 Madison Avenue, between 110th and 111th Streets, in Manhattan.[2] Amended Complaint ¶ 10. The building contains eight residential units and two commercial units. Amended Complaint ¶ 36. Apparently at the time of purchase, the building at 1657 Madison Avenue, like many in that neighborhood at the time, was in a state of deterioration. There were some tenants in the building at the time of purchase, though their number is uncertain.

It appears that shortly after plaintiffs purchased the property, the City began a series of inspectorial and enforcement actions through at least five separate agencies.[3] It is the nature and purpose of these actions which is now in dispute. Plaintiffs claim that the actions undertaken by the City in relation to 1657 Madison Avenue, described below, were done in furtherance of a conspiracy by various City employees to take the property from plaintiffs and transfer it to City ownership. The City

---

1. The defendants represented in this motion are: The City of New York, Mayor Edward I. Koch, the Department of Housing Preservation and Development, the Department of Buildings, the Department of General Services, the Department of Finance, the Law Department, Wilfredo Vargas, Alfred Siegal, Frederick Pucci, George C. Sakona, Abraham Biderman, Peter L. Zimroth, and Isaac Salem. The other defendants in the action are not covered by this motion or by the resolution of this motion by the Court.

2. The City's official designation of the location of the building for mapping purposes is Block 1616, Lot 20, New York, New York. Affidavit of Robin R. Rossenfeld, Esq., sworn to on February 3, 1989, ¶ 12.

3. The City agencies involved are: the Department of Housing Preservation and Development, the Department of Buildings, the Department of Finance, the Department of General Services, and the Law Department.

responds that these various actions were proper enforcement actions, all accomplished in accordance with the New York City Charter and the New York City Administrative Code.

The actions taken by City agencies in regard to 1657 Madison Avenue are as follows. On February 5, 1985, the Department of Housing Preservation and Development ("HPD") issued a Vacate Order against 1657 Madison Avenue, finding that the building had inadequate heat, no hot or cold running water, no gas supply, and no electric supply to the public hallways. Affidavit of Robin R. Rossenfeld, Esq., sworn to on February 3, 1989 ("Rossenfeld Aff.") ¶ 13; Plaintiffs' Exhibit F. Plaintiffs were given 48 hours to remedy these conditions and were ordered to vacate their tenants pending repairs. *Id.* Defendants allege that the tenants were vacated and relocated at a hotel by the City. Rossenfeld Aff. ¶ 13.

On March 5, 1985, in an unrelated action, the Department of Buildings issued an Unsafe Building Notice. That Notice resulted from an inspection which found 1657 Madison Avenue to be vacant, open, unguarded, and unsafe, and accordingly ordered plaintiffs to seal, repair or demolish the building. Rossenfeld Aff. ¶ 14, Amended Complaint ¶ 21, Plaintiffs' Exhibit G. Plaintiffs allege that they subsequently sealed the building. Amended Complaint ¶ 22. On May 7, 1985, the Unsafe Building Notice was dismissed after a second inspection by the Department of Buildings on May 2, 1985, found that there was at least one occupant on the fourth floor of the building. Plaintiffs' Exhibit L. Further, on May 15, 1985, HPD lifted its February 5, 1985 vacate order based on the affidavit of Eduardo Martinez who claimed to be resident in apartment 4–S at 1657 Madison Avenue. Plaintiffs' Exhibit M.

During the pendency of these administrative actions, Eduardo Martinez, with HPD as statutory impleader, brought an action against plaintiffs for unlawful eviction. On June 5, 1985, the City's request for a preliminary injunction in that matter was denied by the New York State Supreme Court. The court found that there was sufficient factual questions about whether Mr. Martinez actually lived at 1657 Madison Avenue and about the City's conduct toward that property to deny the request for injunctive relief. Plaintiff's Exhibit E. In addition, the City filed an action in Civil Court seeking an order requiring plaintiffs to make repairs on 1657 Madison Avenue. This action and the unlawful eviction action were consolidated by motion of plaintiffs on March 30, 1986. Plaintiffs' Exhibit T.

Plaintiffs wrote to Mayor Edward I. Koch on May 20, 1985, alleging that a conspiracy existed between Mr. Martinez, Nestor Rosado, an assistant corporation counsel, and Carol Steinberg, a member of HPD's legal staff, aimed at taking 1657 Madison Avenue from plaintiffs. Plaintiffs' Exhibit N. Pursuant to that letter, an inquiry was begun by HPD's Inspector General. That investigation apparently found that Mr. Martinez was, in fact, employed by HPD, but could not substantiate that any conspiracy existed. Plaintiffs were informed on April 6, 1986, of that finding, and were also told that Mr. Rosado had been removed from their case. Plaintiffs' Exhibit O. Plaintiffs then added to the flurry of litigation activity over the property by filing, on August 1, 1985, an action in New York State Supreme Court pursuant to N.Y.Civ.Prac.L. & R. 7801 *et seq.* (Article 78). Plaintiffs' action sought reinstatement of HPD's vacate order and the Department of Buildings' Unsafe Building Notice. In fact, the vacate order had been reimposed on July 28, 1985, before the Article 78 action was filed, and the Unsafe Building Notice was reissued on August 9, 1985. Rossenfeld Aff. ¶ 18. With the reissuance of the Notice and the vacate order, the Article 78 action became moot and was dismissed on September 19, 1985. Plaintiffs' Exhibit Q.

The conflicts between plaintiffs and the City appear to have been dormant for about a year thereafter, following the conclusion of the Department of Investigation review. However, on April 9, 1987, the City again took action against plaintiffs, imposing a relocation lien on the property for $35,796.78. This lien allegedly was to

recover the cost to the City of relocating and housing the tenants of 1657 Madison Avenue after the first vacate order was issued in February 1985. Plaintiffs' Exhibit X.

Three weeks later, on April 30, 1987, the Department of General Services ("DGS") informed plaintiffs by mail that the City of New York had assumed ownership of 1657 Madison Avenue pursuant to an *in rem* proceeding brought by the Department of Finance for failure to pay overdue taxes. Plaintiffs' Exhibit U. Plaintiffs were informed in the same letter that they could apply for release of their property by paying the amount due. *Id.* Plaintiffs applied for release of 1657 Madison Avenue from City ownership on June 8, 1987. Plaintiffs' Exhibit Z. Plaintiffs perfected the release of the property on September 4, 1987, by payment of over $9,000 in delinquent taxes and fees. *Id.;* Plaintiffs' Exhibit 4; Plaintiffs' Exhibit 6. The release went into effect on September 7, 1987. *Id.*

At the same time plaintiffs were attempting to recover 1657 Madison Avenue from City ownership, they were also addressing the relocation lien placed on their property by HPD. On August 5, 1987, plaintiffs met with Isaac Salem of the Law Department regarding the lien. At that meeting plaintiffs received a letter from Mr. Salem stating that the City would take no steps to enforce the lien until after October 31, 1987. Plaintiffs' Exhibit Y.

On December 8, 1987, plaintiffs filed this action *pro se,* alleging unconstitutional acts on the part of the City and its employees. By order of this Court dated December 14, 1987, the case was referred to United States Magistrate Sharon Grubin of this Court for general pretrial. After a conference with the parties, the Magistrate issued an order dated February 16, 1988, placing the case on the suspense calendar and ordering plaintiffs to inform the Court by April 29, 1988, whether they wished to pursue the case. On April 28, 1988, plaintiffs informed the Magistrate that they had retained counsel and would proceed. An amended complaint was filed on August 11, 1988. On February 3, 1989, the City defen-

dants, in lieu of an answer, filed this motion to dismiss.

DISCUSSION

A motion to dismiss under Fed.R.Civ.P. 12 must be denied "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), *citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Morales v. New York State Department of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). The Court must accept the plaintiffs' allegations of facts as true together with such reasonable inferences as may be drawn in its favor. *Murray v. City of Milford, Connecticut,* 380 F.2d 468, 470 (2d Cir.1967). *See also Scheuer, supra,* 416 U.S. at 236, 94 S.Ct. at 1686. Fed.R.Civ.P. 8 requires only " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed. 2d 80 (1957) (*cited in Hishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). For the purposes of a Rule 12 motion, "The pleading is deemed to include any document attached to it as an exhibit, Fed.R.Civ.P. 10(c), or any document included in it by reference." *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985) (citations omitted).

"The function of a motion to dismiss 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (citation omitted). "Dismissal of a complaint for failure to state a claim is a 'drastic step,' " *Meyer v. Oppenheimer Management Corp.,* 764 F.2d 76, 80 (2d Cir.1985) (citations omitted).

Plaintiffs' complaint is a difficult document to assess. The factual and legal allegations are intertwined and often overlap. What is clear is that plaintiffs allege violations of 42 U.S.C. §§ 1983, 1985 and

1986. Plaintiffs claim that the City's administrative actions, individually and together, violated plaintiffs' due process rights. Further, plaintiffs claim that various defendants conspired to deprive plaintiffs of their property rights in 1657 Madison Avenue. The central person in the alleged conspiracy is Eduardo Martinez, an HPD employee. Martinez allegedly worked as a superintendent in some City-owned buildings located near plaintiffs' property. It was also Martinez, while apparently residing at 1657 Madison Avenue, who allegedly caused the vacate order of December 5, 1985 to be lifted and who also filed the unlawful eviction action against plaintiffs in which HPD joined. Plaintiffs allege that various City employees from HPD and the Law Department conspired with Martinez to force plaintiffs to lose or to surrender their rights to 1657 Madison Avenue in order that Martinez would get the superintendent job for that property when it was taken over by the City and thus increase his income.[4] Plaintiffs allege that this conspiracy continued through the *in rem* proceeding taken by DGS and the Department of Finance in the summer of 1987. It is necessary to take these claims in turn.

*A) Section 1983 Claims*

Plaintiffs allege that defendants' actions have violated their due process and equal protection rights, and have thus claimed damages pursuant 42 U.S.C. § 1983. "It is fundamental ... that § 1983 creates no independent, substantive constitutional rights but rather is a vehicle for enforcing such rights." *Rosa R. v. Connelly,* 889 F.2d 435 (2d Cir.1989); *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1915–16, 60 L.Ed.2d 508 (1979). In order to state a claim under § 1983, plaintiffs must allege that, first, the conduct complained of was committed by a person acting under color of state law, and, second, that such conduct deprived plaintiffs of a right, privilege or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). With regard to the City defendants before the Court on this motion, there is no doubt that plaintiffs meet the requirement that a defendant's actions be taken under color of state law. All the City defendants are either parts of the municipality of the City of New York or its employees, and all their alleged actions were, on the face of the complaint, taken in the course of their duties as City employees. The Supreme Court has held that a municipality itself can be held liable under § 1983 under certain limited conditions. *Monell v. New York Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

All of plaintiffs' claims alleging that any of the individual administrative actions violated their due process rights must be dismissed. In each affirmative action taken by the City, notice was given, and there was some opportunity to be heard. Plaintiffs' own actions belie their claims. Plaintiffs challenged the original vacate order before Justice Schlessinger of the New York City Civil Court. Then, after the vacate order was revoked, the remedy they apparently sought from Justice Schlessinger, plaintiffs brought an Article 78 action to have that same order reinstated. Plaintiffs now claim that their due process rights were denied because the vacate order and Unsafe Building Notice were reinstated before a hearing was held on the Article 78 action, thus giving plaintiffs the relief they requested. Plaintiffs' position does not withstand even a cursory reading. Simply stated, a party desiring relief does not have a right to a hearing when the relief desired is granted before a hearing is held.

---

**4.** Plaintiffs have also presented an affidavit which asserts that Martinez threatened Mr. Levy on at least two occasions. Affidavit of Albert Hernandez, sworn to on March 1, 1989 ("Hernandez Aff."), ¶ 3.

■ Plaintiffs are correct that the law requires an opportunity to be heard when personal or property rights are threatened by state action. *See, e.g., Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). However, the scope of the due process requirement is not nearly as broad as plaintiffs seem to believe. The Supreme Court has held that cases outlining the requirements of due process

> merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided. The usual rule has been "[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity for ultimate judicial determination of liability is adequate."

*Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 611, 94 S.Ct. 1895, 1902, 40 L.Ed.2d 406 (1974), *quoting Phillips v. Commissioner,* 283 U.S. 589, 596–97, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931).

In the case of the vacate order, plaintiffs had an adequate opportunity to be heard and, in fact, were heard in the Civil Court of the City of New York. The Unsafe Building Notice imposed by the Buildings Department by its terms provided plaintiffs with the opportunity to challenge the findings of the building inspector. Further, the relocation lien imposed on the property as a result of the vacate order also provided on its face an opportunity to challenge the lien. In this case, plaintiffs did, in fact, challenge the lien and had an opportunity to appear before an attorney at the Law Department who granted plaintiffs a stay of the lien.

Plaintiffs most extensive attack is on the City's *in rem* foreclosure procedure. They allege that the Second Circuit has ruled in *Burtnieks v. City of New York,* 716 F.2d 982 (2d Cir.1983) that the City must provide a predeprivation hearing prior to beginning its *in rem* proceeding.[5] This is not the holding of the Court in *Burtnieks.* In that case the plaintiff, similar to the plaintiffs now before this Court, failed to pay their taxes for a period of time. Accordingly, the City acquired title pursuant to a tax lien foreclosure. However, pursuant to Sections D17–12.0 and D17–25.0 of the Administrative Code of the City of New York, that property seizure was subject to plaintiff's right redeem title. As with the case before this Court, plaintiff in *Burtnieks* obtained release of the property by paying the amounts owed. Up to this point in the proceeding, plaintiff in *Burtnieks* made no challenge to any action taken by the City. The action challenged by plaintiff involved actions taken *after* the *in rem* proceeding had been completed. The challenged action involved a City-ordered demolition of plaintiff's property which was accomplished before any hearing was held. The demolition of a structure is a deprivation of property rights of a magnitude substantially greater than any claimed by plaintiffs in this Court. Accordingly, *Burtnieks* does not apply to the instant claims.

■ Further, the exact foreclosure procedure challenged by plaintiffs has been upheld by courts in this Circuit. *See Weigner v. City of New York,* 668 F.Supp. 135 (E.D.N.Y.1987). *See also Nitchie Barrett Realty Corp. v. Biderman,* 704 F.Supp. 369 (S.D.N.Y.1988) (holding redemption proceedings within the *in rem* process do not violate due process). For these reasons, plaintiffs' challenges to the City's administrative proceedings against them are dismissed.[6]

---

**5.** Plaintiffs seem to confuse the *in rem* proceeding which was instituted for non-payment of taxes with the relocation lien imposed by HPD. The relocation lien was stayed by the letter delivered to plaintiffs from Assistant Corporation Counsel Salem dated August 5, 1987. Plaintiffs' Exhibit Y. None of the charges which lead to the *in rem* proceeding against 1657 Madison Avenue bear any relation to the

relocation lien. *See* Plaintiffs' Exhibit 6. The lien and the *in rem* proceeding are two completely separate and unrelated actions.

**6.** Plaintiffs raise an additional due process claim in their Memorandum of Law in opposition to the motion to dismiss. In their Memorandum, plaintiffs allege that the City's entire *in rem* process, including the City's right to conduct a sheriff's sale of the property if the fore-

Plaintiffs in their complaint also allege that actions of certain defendants violated plaintiffs' equal protection rights. "The guarantee of equal protection ... is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental actions." *Harris v. McRae*, 448 U.S. 297, 322, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980). "It is true that facially neutral conduct can constitute discrimination in violation of the Equal Protection Clause; however, such a claim requires that a plaintiff show an intent to discriminate against the subject class." *Soberal–Perez v. Heckler*, 717 F.2d 36, 41–42 (2d Cir.1983). "To establish intentional discrimination, a plaintiff must show that 'the decisionmaker ... selected or reaffirmed a particular course of action at least "because of" not merely "in spite of" its adverse affect upon an identifiable group.' " *Id.* at 42, *quoting Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). The Court declines plaintiffs' implicit invitation to define New York City landholders as a suspect class. Indeed, plaintiffs have made no showing that they are a member of an identifiable, discriminated-against group, and, thus, their equal protection claims under § 1983 must also fail.

## B) Section 1985 Claims

Plaintiffs further make claims pursuant to 42 U.S.C. § 1985, apparently alleging that Martinez and other City officials conspired to deprive plaintiffs of their property rights. It is not clear from the pleadings whether plaintiffs make this claim pursuant to § 1985(2) or § 1985(3).[7] Despite this lack of certainty, the Court will address the possibility that the claim was raised pursuant to both subsections.

Any of plaintiffs' claims in this matter pursuant to § 1985(3)[8] are, as a matter of law, deficient. The starting point for a discussion of § 1985(3) is *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), in which the Supreme Court laid out the requirements for an action brought under that section. For the purposes of the case now before the Court, the most important criterion is that a claim under § 1985(3) must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." 403 U.S. at 102, 91 S.Ct. at 1798. The Court has not, since *Griffin,* insisted that the discriminatory animus alleged be racial in character. In *United Brotherhood of Carpenters &*

closure process is completed, is violative of the rights of not only the plaintiffs, but of all similarly situated landlords. Plaintiffs' Memorandum of Law at 4. But this is an issue which was not directly raised in plaintiffs' complaint. An attempt to bring a new cause of action into a case in this manner is improper, and thus the claims will not be fully considered by this Court. The Court does feel it necessary to make three points. First, plaintiffs' property was not subject to a sheriff's sale, and thus plaintiffs lack standing to challenge that proceeding. Second, plaintiffs' claim on behalf of similarly situated landowners requires a class action pursuant to Fed.R.Civ.P. 23. The action before the Court is an individual action, not a class action, and thus plaintiffs cannot, in their current procedural posture, make claims on behalf of nonparties. Third, the Court reiterates that the City's *in rem* process has already undergone and survived judicial scrutiny. *Weigner, supra.*

7. Plaintiffs' Memorandum of Law appears to address the claim as one arising under § 1985(3). Plaintiffs' Memorandum of Law at

28. Nonetheless, the Court will address both subsections.

8. 42 U.S.C. § 1985(3) provides in part:

If one or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the construed authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*Joiners v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) the Court indicated that the legislative history of the section could be "construed to" reach conspiracies aimed at any class or organization on account of its political views or activities," religious affiliation, or even state origin. 463 U.S. at 837, 103 S.Ct. at 3360–61.[9] Even under this less restricted view of § 1985(3), it is clear that the alleged conspiracy must be directed at a class or group and must involve a showing of discriminatory animus. *See Keating v. Carey,* 706 F.2d 377, 387–88 (2d Cir.1983); *New York State Organization for Women v. Terry,* 704 F.Supp. 1247, 1259 (S.D.N.Y. 1989).

Plaintiffs have alleged no class-based discriminatory animus in their conspiracy claims. Plaintiffs are white individuals and do not claim any membership or affiliation in relation to their claims which would al-low the Court to find that the alleged conspiracy is directed at any class or group. Accordingly, plaintiffs' claims arising under § 1985(3) must be dismissed.[10]

■ If plaintiffs' claims are brought pursuant to § 1985(2), they also will fail as a matter of law.[11] Section 1985(2) is divided into two clauses. The first clause addresses conspiracies to interfere with proceedings in federal courts. The Supreme Court has ruled that it is not necessary to make a showing of discriminatory animus in claims under the first clause of § 1985(2). *Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983). However, the Court has not ruled on whether a discriminatory animus must be shown under the second clause of § 1985(2) relating to state court proceedings. Fortunately, this Court is not placed in the position of having to make that determination.[12] The essence of plain-

9. The Court did state that § 1985(3) is not available for "conspiracies motivated by bias toward others on account of their *economic* views, status, or activities." 463 U.S. at 837, 103 S.Ct. at 3360–61 (emphasis in original).

10. Plaintiffs point to *Peck v. United States,* 470 F.Supp. 1003 (S.D.N.Y.1979) in support of their claim that an individual, not a member of any *suspect or otherwise discriminated-against* class, may maintain an action under § 1985(3). Plaintiffs misread that case. In *Peck,* the plaintiff, a white individual who was attacked while participating in a "Freedom Ride" in support of civil rights in Alabama in 1961, brought a claim under § 1985(3) alleging that the attack violated his rights. The court found that Peck could "assert that he was the victim of a conspiracy in violation of 42 U.S.C. § 1985(3) even though he is white. . . ." 470 F.Supp. at 1013. It is on this quote that plaintiffs here rest their claim under § 1985(3). But plaintiffs have taken that quote from *Peck* (and the headnote that repeats it) out of context. In fact, the conspiracy alleged in *Peck* was not directed at individuals, but at a group: the Freedom Riders, of which Peck was a member. And the court in *Peck* specifically found that the conspiracy alleged "is motivated by racial animus and is intended to deprive a class of their right to interstate travel." 490 F.Supp. at 1012. All the quote cited by plaintiffs means is that Peck could not be excluded from asserting a claim as a member of that discriminated-against class simply because he was white. Plaintiffs here have no claim of such class membership.

11. 42 U.S.C. § 1985(2) provides:

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with the intent to deny any citizen the equal protection of the laws, or to injure him in his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws; . . . the party so injured may have an action . . .

12. The Court does note, however, that the Supreme Court's decision in *Kush,* when read in conjunction with the decisions in *Griffin v. Breckenridge, supra,* and *United Brotherhood of Carpenters v. Scott, supra,* would seem to indicate that a showing of discriminatory animus is necessary for an action under the second clause of § 1985(2). In *Kush,* the Court focused on the absence of equal protection language in the first clause of § 1985(2) to find that a showing of discriminatory animus was not necessary. 460 U.S. at 726, 103 S.Ct. at 1487. Equal protection

tiffs' claims, construed in the broadest fashion possible, is that some of the defendants conspired to restrict plaintiffs' access to hearings under state law. In particular, plaintiffs appear to point to three alleged incidences. First, plaintiffs claim that defendants prevented their opportunity to a hearing pursuant to Article 78 on the vacate and unsafe building orders. Second, plaintiffs make allegations that a lawyer for HPD demanded a bribe or else she would abuse State process to harass the plaintiffs. Finally, there is an allegation that one of the defendants, not covered by this motion, demanded money from plaintiffs to bribe a New York State judge, and that defendants generally abused the process of the state courts.

Taking these allegations as true, as the Court must for the purposes of this motion, nonetheless, plaintiffs claims under § 1985(2) cannot survive. To make a claim under § 1985(2), plaintiffs must make a showing that they are a member of a group or organization. Any claim of individual discrimination under § 1985 is foreclosed. *Gleason v. McBride*, 869 F.2d 688, 695 (2d Cir.1989). Nothing in plaintiffs' claims under § 1985(2) indicate that plaintiffs are part of a discriminated-against group. Plaintiffs allege that all property owners in the City are discriminated against in the fashion they are, but there is no showing, even in a liberal reading of the complaint, that the actions complained of in the complaint have been taken against any other landholder.[13]

### C) Section 1986 Claims

Plaintiffs also allege that they are entitled to relief under 42 U.S.C. § 1986. Section 1986 "merely gives a remedy for misprision of a violation of 42 U.S.C.

§ 1985." *Williams v. St. Joseph's Hospital*, 629 F.2d 448, 452 (7th Cir.1980); *Spencer v. Casavilla*, 717 F.Supp. 1057, 1062 n. 1 (S.D.N.Y.1989). "Having failed to state a cause of action under § 1985, plaintiff has also failed to state a claim under § 1986." *Dacey v. Dorsey*, 568 F.2d 275, 277 (2d Cir.), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 405 (1978); *Katz v. Morgenthau*, 709 F.Supp. 1219, 1236 (S.D.N.Y.1989). Since the plaintiffs in the action now before the Court have failed to state a cause of action under § 1985, their claims under § 1986 must be dismissed.

### D) Rule 11 Sanctions

Defendants have moved for sanctions to be imposed on plaintiffs pursuant to Fed.R.Civ.P. 11. "[I]n imposing rule 11 sanctions, the court is to avoid hindsight and resolve all doubts in favor of the signer." *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir.1986), *cert. denied sub nom. Suffolk County v. Graseck*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Plaintiffs and their attorneys in civil rights actions are held to the same standards under Rule 11 as attorneys in all other types of actions. "All attorneys are to be held to the same standards of conduct, no matter who their clients are.... [A]ll attorneys are expected to conduct themselves and their lawsuits according to the standards necessary for the proper, efficient functioning of our legal system." *Id.* at 1280–81. *Cf. Roadway Express, Inc. v. Piper*, 447 U.S. 752, 762, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980).[14]

Defendants claim that plaintiffs' claims are frivolous and that plaintiffs' counsel failed to make sufficient inquiry into the claim before filing the amended

---

**13.** As discussed above, plaintiffs have alleged in their complaint that the City's *in rem* fore-

language is present in clause two of § 1985(2), and thus, since it was that same language that the Court used to require a finding of discriminatory animus in § 1985(3) cases in both *Griffin* and *Scott*, it would seem logical that discriminatory animus would be required for an action under the second clause of § 1985(2). *See Keating v. Carey*, 706 F.2d 377, 385 (2d Cir.1983).

closure process is unconstitutional. The Court has already noted that this same *in rem* process has already been upheld as constitutional in other actions. The Court will not disturb those prior rulings. Accordingly, any claim against the *in rem* process, whether brought under § 1983 or § 1985, will fail.

**14.** The Court notes that Rule 11 sanctions may be imposed on the attorney, the client, or both. *Oliveri*, 803 F.2d at 1274.

complaint. A brief review of the procedural history of this case is necessary at this point. This action was originally filed *pro se*. After a conference with Magistrate Grubin, plaintiffs retained counsel to pursue the action. Counsel took plaintiffs' original *pro se* complaint and recrafted it into a somewhat more manageable form and filed it as an amended complaint. The amended complaint is confusing in places and contains allegations that are contrary to some of the exhibits attached to the same complaint.[15] However, the Court cannot, and should not, impose sanctions simply for filing imperfect papers.

■ Defendants claim that, in preparing the amended complaint, plaintiffs' counsel failed to undertake a reasonable inquiry into the sufficiency of that complaint, as required under Rule 11. *See Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985). In particular, defendants' counsel alleges that plaintiffs' counsel, Mr. Previto, told her that he had done no independent research and simply rewrote plaintiffs' *pro se* complaint. Rossenfeld Aff. ¶ 33. Plaintiffs' counsel explicitly rejects this version of the conversation between opposing counsel and himself, and asserts that he has made efforts to verify the legitimacy of the complaint. Affidavit of Michael L. Previto, Esq., sworn to on March 6, 1989, ¶¶ 27–40. Given Mr. Previto's explicit denial of the statements which defendants' counsel attribute to him, the Court declines to consider those statements as evidence of a failure to verify the legitimacy of the claims.

The Court's inquiry does not end here. The question remains, regardless of plaintiffs' counsel's assurances that he did do research, whether his conduct in relation to the pleading before the Court was such as to warrant the imposition of sanctions. The standard for such a determination is an objective one. "[S]anctions shall be imposed when it appears that a competent attorney could not form the requisite reasonable belief as to the validity of what is asserted in the [pleading]." *Oliveri*, 803 F.2d at 1275; *Eastway Construction Corp.*, 762 F.2d at 254.

■ This Court is reluctant to impose Rule 11 sanctions absent egregious conduct on the part of counsel. The Court cannot find such neglect of duty here. Counsel has provided the Court with substantial documentation to back plaintiffs' factual claims. Indeed, the Court, based on the documents and defendants' own description of the turn of events leading to this action, can understand plaintiffs' and their counsel's frustration and concern regarding defendants' action. The overlapping and contradictory orders filed, vacated, and then refiled in a series of legal, but time-consuming and frustrating, administrative proceedings certainly could give rise to suspicions on the part of many citizens and lawyers.[16] The fact that these claims do not state a cause of action under the federal law cited by plaintiffs does not means that the complaint was filed frivolously. Almost all of the events plaintiffs allege are supported by documentary evidence or by affidavits. In an action such as this one, where individuals are claiming their civil rights have been violated, the Court does not wish to place itself in the position of repressing attempts to vindicate those

---

**15.** In fairness, the Court notes that defendants' papers also contained allegations which were directly contradicted by the documentary evidence before the Court. For example, defendants' counsel states in her affidavit that the vacate order was lifted "possibly because repairs were being made under the consent order." Rossenfeld Aff. ¶ 15. In fact, the letter to plaintiffs notifying them that the vacate order had been rescinded clearly stated that the action had been taken "based on an affidavit by tenant ... and memorandum from Counsel to Deputy Commissioner." Plaintiffs' Exhibit M. At best, defendants' counsel's description of the meaning of that letter is disingenuous. At worst, it could be considered a misrepresentation.

**16.** The fact that the Court finds that the actions taken by defendants against plaintiffs' property do not support the claims asserted by plaintiffs does not indicate the Court's approval of those actions. The City and its employees have evidenced by their lack of coordination of their proceedings related to distressed properties a disturbing indifference to efficiency and to the convenience and comfort of those affected by those rulings who, regardless of their position as landowners, are as deserving of consideration from their government as any other citizen.

rights by an injudicious use of sanctions. Accordingly, defendants' Rule 11 motion is denied.[17]

Finally, the Court notes that plaintiffs appear to desire to file a cross-motion for a default judgment against two of the defendants not represented in this motion. There was no notice of cross-motion filed with the Court in this regard as required by Fed.R.Civ.P. 7(b) and Rules 3(a) and 3(b) of the Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York. Accordingly, the Court will not consider the issues raised by plaintiffs regarding a potential default judgment at this time.

CONCLUSION

Plaintiffs claims against defendants the City of New York, Mayor Edward I. Koch, the Department of Housing Preservation and Development, the Department of Finance, the Department of General Services, the Department of Buildings, the Law Department, Wilfredo Vargas, Alfred Siegal, Frederick Pucci, George C. Sakona, Abraham Biderman, Peter L. Zimroth, and Isaac Salem are DISMISSED with prejudice.[18]

The reference of this case to Magistrate Sharon Grubin for general pretrial supervision is renewed, with instruction to resolve the apparent issues of service and appearance of certain of the remaining defendants in a timely fashion.

SO ORDERED.

---

**17.** The Court notes at this point that all claims against all defendants represented in this motion are dismissed. The Court takes no position at this time, given the lack of evidence before it, whether sanctions would be appropriate if plaintiffs pursue the same claims on the same bases against the remaining defendants.

**18.** Claims apparently remain against named defendants Eduardo Martinez, Carol Steinberg, Nestor Rosado, and the law firm of Finklestein, Borah, Schwartz, Altschuler & Goldstein.